# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| JULIUS WILSON, ) | |
| ) | |
| Plaintiff, ) | No. 2:15-cv-02170-DCN |
| vs. ) | |
| ) | |
| FIRST CLASS PATROL OFFICERS ) | |
| MICHAEL SLAGER, BRAD WOODS, ) | |
| and JEROME CLEMENS; NORTH ) | |
| CHARLESTON POLICE DEPARTMENT, ) | |
| CITY OF NORTH CHARLESTON, and, ) | **ORDER** |
| EDDIE DRIGGERS, both individually ) | |
| And in his official capacity as Chief of ) | |
| Police, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

This matter is before the court on plaintiff Julius Wilson's ("Wilson") civil action alleging causes of action under 42 U.S.C. §§ 1983 and 1988 and the South Carolina Torts Claims Act ("SCTCA"), S.C. Code Ann. §§ 15-78-10 et seq. Before the court is defendants North Charleston Police Department ("the NCPD"), City of North Charleston ("the City"), and Eddie Driggers' ("Driggers") (collectively "defendants") motion to dismiss and motion to strike. The court referred all pretrial proceedings in this case to United States Magistrate Judge Mary Gordon Baker pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Magistrate Judge Baker, in a Report and Recommendation ("R&R"), recommended that the court grant in part and deny in part defendants' motion to dismiss and grant in part and deny in part defendants' motion to strike. For the reasons set forth below, the court follows the recommendations of the magistrate judge and dismisses the § 1983 claims against the

1

NCPD but allows the claims to proceed against the City and Driggers in his individual capacity, and dismisses Wilson's SCTCA claims against the NCPD and Driggers, but allows the claims to proceed against the City.

## I. BACKGROUND

On August 25, 2014, defendant officer Brad Woods ("Woods") pulled over plaintiff Julius Wilson ("Wilson"). Am. Compl. ¶ 51. Wilson gave Woods a valid Georgia driver's license. Id. ¶ 52. Defendants officer Michael Slager ("Slager") and officer Jerome Clemens ("Clemens") joined the stop shortly thereafter. Id. ¶ 55–57. Slager, Woods, and Clemens arrested Wilson for driving under a suspended South Carolina license. Id. ¶ 25. Wilson alleges that Slager, Woods, and Clemens forcibly pulled him out of the vehicle and restrained him face down on the ground. Id. ¶ 26. Wilson alleges that while his hands were being placed behind his back, Slager shouted "watch out! I'm going to tase!" Id. ¶ 61. Wilson alleges Slager tased him while he was cooperating fully with the officers as he was face down with his hands behind his back. Id. ¶¶ 28–30. According to the amended complaint, despite Wilson's cooperation, Slager tased his back in violation of NCPD's policies and procedures. Id. ¶ 31. Wilson alleges that NCPD officers previously used tasers unnecessarily and excessively, but that the NCPD and the City did nothing to investigate the conduct or punish or correct their behavior. Id. ¶ 21–32.

The NCPD hired Slager in 2010, at which time he was issued a taser. Id. ¶ 10. Around 2012, Driggers became the Chief of Police for the NCPD. Id. ¶ 37.[1] Driggers

---

[1] Driggers asserts that he was sworn in as Chief of Police on January 28, 2013. Defs.' Mot. to Dismiss 3.

kept the same taser policies in place after he became Chief of Police. Id. ¶ 37. Citing numerous specific incidents and media reports, Wilson alleges that the NCPD's taser use policies and affirmative decisions and omissions of individual policymakers led to African Americans being disproportionally tased. Id. ¶¶ 25–30, 44–46, 73–75. Wilson further alleges that the NCPD does not provide any training for the use of tasers but rather delegates all training to the manufacturer of the tasers. Id. ¶¶ 42–44. According to the amended complaint, the taser training provided by the manufacturer focuses on the use of tasers and not the use of force. Id. ¶ 43. Wilson alleges that the NCPD's taser use has come under repeated scrutiny, sparking the NCPD to change the wording used in their reports to make the taser use appear justified. Id. ¶ 48.

Wilson filed the present action on April 10, 2015 in the Court of Common Pleas for Charleston County. Defendants filed a joint notice of removal on May 28, 2015. On June 4, 2015, the NCPD, the City, and Driggers all filed a motion to dismiss. Thereafter, Wilson filed an amended complaint with this court on June 10, 2015. Wilson brings the following three causes of action: (1) improper search and seizure, excessive force, and due process violations pursuant to 42 U.S.C. § 1983 against all defendants; (2) deliberate indifference pursuant to 42 U.S.C. § 1983 against all defendants; and (3) negligence and gross negligence under the SCTCA as to Driggers in his official capacity, the NCPD, and the City.[2]

---

[2]     Wilson sues Driggers in both his individual and representative capacity pursuant to 42 U.S.C. § 1983 and the South Carolina Torts Claims Act ("SCTCA") for his responsibility for the management, training, and operation of the NCPD. Am. Compl. ¶ 7. Wilson sues Slager, Woods, and Clemens in the individual capacities, alleging that they were acting within the course and scope of their employment with the NCPD and the City. Id. ¶ 10. Importantly, Wilson states in his complaint that he does not seek punitive

3

On June 24, 2015, Driggers, the City, and the NCPD filed a second motion to dismiss and a motion to strike pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f), and the protections and immunities set forth in SCTCA §§ 15-78-10 to -220. ECF No. 17. In the alternative, defendants move to stay the causes of action against the NCPD, the City, and Driggers pending a determination of whether the individual officers violated Wilson's constitutional rights, or, in the alternative, to cabin discovery. Lastly, defendants ask the court to require Wilson to "make more definite and certain any claims against [the City, the NCPD, and Driggers] in accordance with Fed. R. Civ. P. 8 as it relates to negligent hiring, failure to train, and failure to supervise." Defs.' Mot. 1. Wilson filed a response in opposition to the motion to dismiss on July 13, 2015. ECF No. 22. On January 25, 2016, Judge Baker issued an R&R, recommending that this court: (1) dismiss Wilson's 42 U.S.C. § 1983 claims against the NCPD, but allow the § 1983 claims against the City and Driggers to proceed; (2) dismiss Wilson's SCTCA claims against the NCPD and Driggers, but allow the claim to proceed against the City; and (3) strike Wilson's prayer for punitive damages against the City and any § 1983 claim under respondeat superior, but allow Wilson's claims for joint and several liability under § 1983 to remain in the amended complaint. Defendants filed objections to the R&R on February 11, 2016. Wilson filed a response to the defendants' objections on February 28, 2016. The motions have been fully briefed and are now ripe for the court's review.

---

damages against NCPD, the City, or Driggers in his official capacity as Chief of Police. Id. ¶ 16.

## II.   STANDARD

### A.     R&R

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140, 149–50 (1985). In absence of a timely filed objection to a magistrate judge's R&R, this court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ. P. 72 advisory committee's note). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court. Mathews v. Weber, 423 U.S. 261, 270–71 (1976). The court may adopt the portions of the R&R to which the plaintiff did not object, as a party's failure to object is accepted as agreement with the conclusions of the magistrate judge. Thomas, 474 U.S. at 149–50. This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration. 28 U.S.C. § 636(b)(1).

### B.     Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." When considering a Rule 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. See E.I. du Pont de Nemours

& Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

On a motion to dismiss, the court's task is limited to determining whether the complaint states a "plausible claim for relief." Id. at 679. A complaint must contain sufficient factual allegations in addition to legal conclusions. Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "Facts pled that are 'merely consistent with' liability are not sufficient." A Soc'y Without a Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011) (quoting Iqbal, 556 U.S. at 678).

### C. Stay Discovery

In relevant part, Federal Rule of Civil Procedure 26(c) provides that a "Court may, for good cause, issue an order to protect a party or person from . . . undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; [or] (B) specifying terms, including time and place, for the disclosure or discovery." Fed. R. Civ. P. 26(c)(1) (A)-(B). Where good cause is shown by the moving party, Rule 26(c) "vests the court with discretion to stay discovery . . . ." Bragg v. United States, 2010 WL 3835080, at *1 (S.D.W. Va. Sept.29, 2010); United States v. Any & All Assets of Shane Co., 147 F.R.D. 99, 101 (M.D.N.C. 1993) ("The motion to stay, in reality, seeks a protective order pursuant to Fed. R. Civ. P. 26(c) and thus the petitioner

6

must show good cause."); 10A John Kimpflen et al., Fed. Proc., L.Ed. § 26:334 (2012) ("Because a motion to stay discovery is tantamount to a request for a protective order prohibiting or limiting discovery pursuant to Fed. R. Civ. P. 26(c)(2), a motion to stay discovery may be granted pursuant to Fed. R. Civ. P. 26(c)(2), but the moving party bears the burden of showing good cause and reasonableness.").

The moving party "may not rely upon 'stereotyped and conclusory statements,'" to establish good cause; rather, the moving party "must present a 'particular and specific demonstration of fact' as to why a protective order [staying discovery] should issue." Baron Fin. Corp. v. Natanzon, 240 F.R.D. 200, 202 (D. Md. 2006) (quoting 8A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2035 (2d ed.1994)). "'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing.'" Id. (quoting Merit Indus., Inc. v. Feuer, 201 F.R.D. 382, 384–85 (E.D. Pa. 2001)). In the context of a request to stay discovery, "[t]he moving party must come forward with a specific factual showing that the interest of justice and considerations of prejudice and undue burden to the parties require a protective order and that the benefits of a stay outweigh the cost of delay.'" Kimpflen, § 26:334 (quoting Kron Med. Corp. v. Groth, 119 F.R.D. 636, 638 (M.D.N.C. 1988)).

Rule 26(c)'s good cause requirement "creates a rather high hurdle" for the moving party. Natanzon, 240 F.R.D. at 202; Medlin v. Andrew, 113 F.R.D. 650, 653 (M.D.N.C. 1987) (noting the "heavy burden of demonstrating the good cause" for a Rule 26(c) order). However, the Rule also "'confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required.'" Furlow v. United States, 55 F. Supp. 2d 360, 366 (D. Md. 1999) (quoting Seattle Times

Co. v. Rhinehart, 467 U.S. 20, 36 (1984)); see also Scarberry v. Huffman, 2010 WL 4068923, at *2 n.1 (S.D.W. Va. Oct.15, 2010) (explaining that "the issues raised by a motion to stay discovery implicate matters of federal procedural law that fall within the confines of the district court's discretion").

### D.    Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Rule 12(f) motions are generally with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1380 (2d ed. 1990)).

### III.   DISCUSSION

The magistrate judge recommends that this court dismiss the NCPD from this action, dismiss Wilson's SCTCA claims against Driggers, strike Wilson's request for punitive damages against the City, and strike Wilson's § 1983 claims under respondeat superior. Defendants do not object to the aforementioned recommendations. After reviewing the record for clear error and finding none, the court adopts the R&R as it pertains to Wilson's claims against the NCPD, Wilson's SCTCA claims against Driggers, Wilson's request for punitive damages, and Wilson's § 1983 claims to the extent they rely on the doctrine of respondeat superior. However, Driggers objects to the magistrate judge's recommendation insofar as it recommends that Wilson's § 1983 claims against him survive defendants' motion to dismiss. Defs.' Objections 1. Further, defendants

argue that the court should stay the case or, in the alternative, stay discovery pending a liability determination regarding the other defendants.  Id. at 5–6.  The court will address defendants' objections below.

### A.     § 1983 Claims Against Driggers in his Official Capacity

The magistrate judge recommends that the court deny defendants' motion to dismiss as it pertains to Wilson's § 1983 claims against Driggers.  Driggers objects to the recommendation, arguing that Wilson's § 1983 claims against him in his official capacity should be dismissed because the claims are duplicative of those claims against the City.  Defs.' Objections 2–3.  In Wilson's response to defendants' objections, he states that he has "no objection to removing both the caption and paragraphs suing Defendant Driggers under Section 1983 in his official capacity . . . so long as Driggers remains as an individual Defendant subject to the supervisory Section 1983 claim."  Pl.'s Resp. 5.  Wilson "further tempers his lack of objection on the condition the other moving Defendants do not use this concession to argue that they did not 'receive[] notice and an opportunity to respond . . . .'"  Id. (citing Huggins v. Prince George's Cnty., 683 F.3d 525, 532 (4th Cir. 2012) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")).

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) (quoting Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690, n.55 (1978)).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be

treated as a suit against the entity." Id. "It is not a suit against the official personally, for the real party in interest is the entity." Id.; see also Huggins, 683 F.3d at 532 (recognizing that the district court dismissed the § 1983 claims against the individual defendants in their official capacity, allowing the County to remain as the sole defendant because such claims "served as suits against the County"). Because Wilson's § 1983 claims against Driggers in his official capacity are duplicative of his § 1983 claims against the City, such claims against Driggers in his official capacity must be dismissed. See, e.g., Drayton v. Cty. of Charleston, No. 2:14-cv-3488, 2015 WL 4937358, at *3 (D.S.C. Aug. 17, 2015) (recognizing that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" and holding that because "Sheriff Cannon, in his official capacity, and CCSO are essentially the same defendant" the claims against Sheriff Cannon should be dismissed).

Therefore, the court dismisses Wilson's § 1983 claims against Driggers in his official capacity.

### B.    § 1983 Claims Against Driggers in his Individual Capacity

The R&R recommends that the court deny the motion to dismiss as to the § 1983 claims against Driggers, finding that Wilson's Amended Complaint sufficiently alleges a claim of supervisory liability against Driggers. R&R 11–12. Driggers objects to the recommendation, arguing that Wilson's Amended Complaint fails to allege that Driggers had any involvement with the August 25, 2014 incident from which this action arises. Defs.' Objections 3–4. Driggers further argues that he is entitled to qualified immunity. Id. at 3–5.

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). "Liability in this context is not premised on respondeat superior, . . . but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Id. (internal citations omitted). In order to state a § 1983 claim for supervisory liability, a plaintiff must allege:

> (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Wilkins v. Montgomery, 751 F.3d 214, 226–27 (4th Cir. 2014) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994); see also Green v. Beck, 539 F. App'x 78, 80 (4th Cir. 2013) (applying the aforementioned factors to a motion to dismiss). As to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Id. As to the second element, a plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Id. (internal quotation marks omitted). Finally, as to the third element, "proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that

holds a person liable for the natural consequences of his actions." Id. (internal quotation marks and alterations omitted).

Driggers argues that Wilson's complaint consists of legal conclusions couched as factual allegations. Defs.' Objections 3–4. In his Amended Complaint, Wilson alleges that "[f]rom the time Defendants Driggers became [NCPD's] police chief to the present, Driggers was at all times aware of [NCPD's] physical force policy on [t]aser use, was regularly copied on all NCPD records regarding [t]aser use, and continued to actively implement the policy despite the facts" alleged in the Amended Complaint. Am. Compl. ¶¶ 37–38. Wilson further alleges that Driggers failed to train the officers on excessive force and continued to "administer a vague and overbroad policy regarding the justification for [t]aser use within the NCPD, allowing NCPD Officers to justify the use of their [t]asers whenever any physical force was used by the subject officer to take a person into custody, regardless of the degree of physical force actually necessary under the circumstances." Id. ¶ 47; see also id. ¶¶ 49–50. Wilson further alleges that Driggers was copied on all taser-use reports that cleared officers based on "justifications that fell short of the physical force policy as written." Pl.'s Resp. 7; see also Am. Compl. ¶¶ 44–45, 47–49. In support of his allegations, Wilson cites statistics compiled by the Post and Courier and the New York Times, indicating widespread taser misuse. See Am. Compl. ¶¶ 26, 36. Wilson alleges that "[b]y maintaining the physical force and noncompliance policies without proper training . . . and failing to adequately supervise or review [t]aser use by NCPD officers . . . Driggers sanctioned the purposeful omissions in both policy-specificity and training that constituted a practice so persistent, widespread, permanent,

12

and well settled as to constitute the . . . customs and usages with the force of law[,]" causing Wilson's damages.  Am. Compl. ¶ 50.

As set forth above, Wilson alleges that Driggers had not only constructive knowledge, but actual knowledge of NCPD's officers' excessive taser use in violation of the internal policies.  Wilson also alleges that despite his knowledge, Driggers failed to enforce the written force policy or provide adequate training.  Lastly, Wilson avers that Driggers's alleged failures caused the harm.  The court agrees with the magistrate judge and holds that, accepting Wilson's factual allegations as true and drawing all reasonable inferences in Wilson's favor, Wilson has sufficiently alleged a § 1983 claim against Driggers for supervisory liability.  Therefore, the court denies defendants' motion to dismiss Wilson's § 1983 claim against Driggers in his individual capacity.

Driggers also argues that he is entitled to qualified immunity because the law regarding the use of tasers was not clearly established at the time of the underlying allegations, citing the Fourth Circuit's recent opinion in Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892 (2016).  Defs.' Objections 4–5.  Although Driggers did argue that he is entitled to qualified immunity in the motion to dismiss, Defs.' Mot. 9–10, Village of Pinehurst was not yet decided at that time, and the magistrate judge did not discuss qualified immunity.

The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable

13

when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The purpose of the qualified immunity defense is to "give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery, as inquiries of this kind can be peculiarly disruptive of effective government." Behrens v. Pelletier, 516 U.S. 299, 308 (1996) (quotations omitted).

The two prongs of the qualified immunity test may be applied in any order. Pearson, 555 U.S. at 236. To find that a government official is protected by qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002). "To escape dismissal of a complaint on qualified immunity grounds, a plaintiff must (1) allege a violation of a right (2) that is clearly established at the time of the violation." Evans, 703 F.3d at 646 (citing Pearson, 555 U.S. at 231).

"[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage." Tobey v. Jones, 706 F.3d 379, 393–94 (4th Cir.2013) (citing Behrens v. Pelletier, 516 U.S. 299 (1996)). So long as qualified

immunity does not turn on disputed facts, "whether the officer's actions were reasonable is a question of pure law." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.2011) (en banc).

In support of his qualified immunity arguments, Driggers cites Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892 (2016), a recent Fourth Circuit opinion. In Village of Pinehurst, Ronald Armstrong ("Armstrong"), the arrestee decedent, suffered from bipolar disorder and paranoid schizophrenia and had been off of his medication for five days. Id. at 896. Armstrong's sister took him to the hospital, but during the course of his evaluation, he fled. Id. The police located Armstrong acting strangely. Id. Once the commitment papers were finalized, the officers attempted to take Armstrong into custody. Id. Armstrong wrapped his arms and legs around a post, and after only 30 seconds of failed attempts to remove him from the pole, the officers administered a taser. Id. at 897. An officer deployed his taser five separate times over a period of approximately two minutes. Id. The officers were eventually able to remove him from the pole and restrain him after continued resistance. Id. After the officers handcuffed him and left him face down in the grass with his hands and legs shackled, Armstrong became unresponsive. Id. at 897–98. Resuscitation attempts were unsuccessful, and Armstrong was pronounced dead shortly after admission to the hospital. Id. at 898. Armstrong's estate brought an action against the individual police officers pursuant to 42 U.S.C. § 1983, alleging that the officers used excessive force. Id. The district court granted summary judgment, finding that the defendants were entitled to qualified immunity. Id. Analyzing the objective reasonableness standard as outlined in Graham v. Connor, 490 U.S. 386, 388 (1989), the Fourth Circuit held that the officers had used excessive force. Id. at 899. The court then addressed whether the constitutional

right was clearly established, defined the constitutional right at issue as "Armstrong's right not to be subject to tasing while offering stationary and non-violent resistance to a lawful seizure." Id. at 907–08. The court concluded that the constitutional right was not clearly established at the time of Armstrong's seizure. Id. at 908. Therefore, the court held that the officers were entitled to qualified immunity. Id.

  Driggers argues that because the law regarding taser use to stationary and non-violent resistance was not clearly established, the individual officer defendants are entitled to qualified immunity. Defs.' Objections 4–5. Therefore, Driggers argues that there is no constitutional violation on which Wilson's supervisory liability claim may rest. Id. Notably, defendants' original discussion of Driggers' qualified immunity consists of two sentences within their motion to dismiss. See Defs.' Mot. 9-10. Importantly, the Fourth Circuit in Village of Pinehurst does not discuss supervisory liability as it relates to taser use but rather only discusses the individual officers' qualified immunity. While Village of Pinehurst may have some bearing on the case at hand, the actions of the underlying officers have not been briefed. In fact, the parties have not had an opportunity to argue the application of Village of Pinehurst to this case and the individual officer defendants are not parties to the present motion to dismiss. Because the parties have not briefed the merits of the individual officer defendants' alleged constitutional violations, Drigger's qualified immunity, or the application of Village of Pinehurst to the underlying facts of this case, the court finds that qualified immunity is peculiarly well-suited for resolution at the summary judgment stage in this case. See Willingham v. Crooke, 412 F.3d 553, 558–59 (4th Cir. 2005) (discussing that qualified immunity determinations should ordinarily be decided at the summary judgment stage).

Further, the parties have conducted very little discovery. As of the date on which Wilson filed his response to defendants' motion to dismiss, the only discovery conducted were the Rule 26.01 interrogatories. Although defendants submitted a New York Times article, a dash camera video of the incident, and the disposition of Wilson's criminal case, the evidence is not sufficient to make a determination regarding the alleged constitutional violation or whether the law was clearly established. Moreover, as discussed below, defendants' request that the court stay the discovery relating to Wilson's claims against the City and Driggers evinces the lack of discovery thus far. Given the undeveloped record at this stage, there are potential disputed material facts that preclude a ruling on qualified immunity. Raub v. Bowen, 960 F. Supp. 2d 602, 609 (E.D. Va. 2013) ("With such a sparse record, the Court cannot ascertain whether the County Defendants had probable cause or, at the very least, whether the vagaries of existing precedent left the officers without 'clearly established' precedent to guide them in the particular circumstances that they faced. Because the Court is bound to construe the allegations in Raub's favor, it must deny qualified immunity, at least at this stage.").

### C. Motion to Stay the Claims against Driggers and the City, or alternatively, to Stay Discovery

Defendants argue that the court should stay discovery pending a liability determination regarding the individual officer defendants. A supervisory liability claim requires a predicate constitutional violation to proceed. Evans v. Chalmers, 703 F.3d 636, 654 (4th Cir. 2012). For "supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." Id. (quoting Waybright v. Frederick Cty., 528

17

F.3d 199, 203 (4th Cir. 2008)).  Therefore, defendants argue that court should stay Wilson's claims against the City and Driggers pending a determination regarding the individual defendants' liability for the alleged constitutional violations.

In their objections to the R&R, defendants direct the court to the motion to dismiss, in which defendants seem to argue that the cases should be bifurcated.  Defs.' Mot. 10–11.  Citing authority from the Seventh Circuit and the Northern District of Illinois, defendants argue that the court has the discretion to bifurcate Wilson's claims against the municipality from those against the individual police officers.  Id. at 11.  Driggers argues that "[a] stay of the claims against [Driggers and the City] will promote convenience and judicial economy as those claims can only succeed if it is first determined that the individual officers violated [Wilson's] constitutional rights."  Id.  Alternatively, defendants request that the court stay the discovery related to the Monell claims.  Id.  (citing Robles v. Prince George's Cty. Md., 302 F.3d 262, 267 (4th Cir. 2002); Dawson v. Prince George's Cty., 896 F.Supp. 537, 540 (D. Md. 1995) (granting municipal defendants' motion to bifurcate and motion to stay discovery as to issues relevant to Monell claims)).

First and foremost, defendants did not move pursuant to Federal Rule of Civil Procedure 42(b) to bifurcate the claims asserted against the individual officers from those against the City and Driggers.  Although the courts in the cases cited by defendants did bifurcate § 1983 claims against individual officers from the Monell claims, the courts were deciding Rule 42(b) motions to bifurcate and not motions to stay brought in conjunction with a motion to dismiss.  Further, defendants have not demonstrated specific and particular facts to establish good cause to stay discovery.  If defendants wish to

bifurcate Wilson's claims against the individual officers with those against Driggers and the City, defendants should so move pursuant to Rule 42(b), allowing the parties to fully brief, and the court to fully analyze, the issue.

### IV.   CONCLUSION

For the reasons set forth above, the court **ADOPTS** the R&R, **GRANTS IN PART** and **DENIES IN PART** defendants' motion to dismiss, **GRANTS** defendants' motion to strike, and **DENIES** defendants' motion to stay. Specifically, the court dismisses plaintiff's § 1983 claims against the NCPD, but allows the claims to proceed against the City and Driggers in his individual capacity. Further, the court dismisses plaintiff's SCTCA claims against the NCPD and Driggers but allows them to proceed against the City. Lastly, the court strikes plaintiff's request for punitive damages against the City and any § 1983 claim under respondeat superior but allows plaintiff's claims for joint and several liability under § 1983 to remain in the amended complaint.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 31, 2016**
**Charleston, South Carolina**